Filed 12/10/13  In re Christian A. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re CHRISTIAN A., a Person Coming Under the Juvenile Court Law. | B245810 |
| | (Los Angeles County Super. Ct. No. CK73196) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Plaintiff and Respondent, | |
| v. | |
| NAOMI A., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Sherri Sobel, Juvenile Court Referee.  Reversed and remanded with directions.

Merrill Lee Toole, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jacklyn K. Louie, Principal Deputy County Counsel for Plaintiff and Respondent.

Lori Siegel, under appointment by the Court of Appeal, for minor.

Naomi A. (mother) appeals from an order terminating parental rights to her son, Christian A. She argues the court abused its discretion in denying her petition under Welfare and Institutions Code section 388.[1] She also claims it erred in terminating her parental rights under section 366.26. We disagree as to both and affirm. Mother also argues notice was improper pursuant to the Indian Child Welfare Act, Title 25 United State Code section 1901 et seq. (ICWA) and related state-imposed notice requirements. (§ 224.2.) We agree that the juvenile court failed to properly verify that the notices sent by the Department of Children and Family Services (Department) complied with ICWA. We reverse and remand for the limited purpose of compliance with ICWA notice requirements.

## FACTUAL AND PROCEDURAL SUMMARY

Christian A., the minor, was born in May 2003. His half-brothers, Elijah W. and Jeremiah W., were born in February 2004 and February 2009 respectively. Mother became pregnant with Christian when she was a 17-year-old dependent. She did not tell Christian's alleged father, whose whereabouts remain unknown. After mother ran away from home because Christian's maternal grandmother (grandmother) beat her and her siblings, the Department placed her in a home for pregnant teens. Mother, Christian, and Elijah then lived in a variety of different locations, including various motels.

Christian and Elijah were the subjects of a prior dependency case, which we affirmed in *In re C.A., et al. v N.A.* (July 21, 2009, B210137) [nonpub. opn.]. As we explained in that case, mother and her sons first "came to the attention of the Department . . . on June 4, 2008. A Los Angeles police department officer had taken a 13-year-old uncle of the children home because of a school situation. He found Mother's two children (and six others) alone and unsupervised. . . . The home was filthy, smelly, and infested with cockroaches. . . . Filthy beds and bunk beds, with dirty blankets and no sheets, were placed in the single room. Unwashed dishes were piled high in the kitchen

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise indicated.

and the refrigerator and freezer were filthy inside and outside. The children were disheveled, with dirty clothes, hands, and faces. They emitted a foul odor. The police officers told the worker that the children appeared to be hungry. They were fed at the police station, and asked for several meals." (*In re C.A., et al. v N.A.*, *supra*,. B210137.). After the children were placed in protective custody, "[a] petition pursuant to section 300, subdivisions (b) and (g) was filed, alleging that Mother had made an inappropriate plan for the children's care and supervision which placed them at risk of harm." (*Ibid.*)

At the August 4, 2008 adjudication and disposition hearing, the petition was sustained as amended under section 300, subdivision (b), the children removed, and mother ordered to attend individual counseling and parenting classes, to seek employment, and to find appropriate housing. (*In re C.A., et al. v N.A.*, *supra*, B210137.) We affirmed the jurisdictional and dispositional order. (*Ibid.*)

Mother enrolled in individual therapy, and said she was "getting her life together." She attended college to obtain a medical assistant's degree, rented a room, and completed parenting classes. Elijah returned to live with his father, but Christian remained in foster care. After visiting regularly, mother's time with Christian and Elijah decreased after Jeremiah was born in 2009. Mother said she sometimes misunderstood the visit locations, and Christian's foster parents did not wait long enough for her to arrive.

However, by November 30, 2009, a Department report highlighted mother's "pattern of instability." Since the initiation of her case in June 2008, she had lived in seven different places that were "not conducive to her family's stability" and had not completed individual therapy. Although mother recently had started a retail job, her visits with Christian were sporadic. Visits between the brothers remained infrequent due to school schedules.

After the court set a permanent plan hearing, mother began to stabilize her life. She obtained suitable permanent housing and remained employed. The court ordered Christian placed in mother's home under Department supervision with family maintenance services. Subsequent Department reports noted that mother recognized her

past mistakes and was determined to stay on track to provide for her children. Due to mother's full compliance with the case plan, the court terminated jurisdiction over Christian and Elijah on June 23, 2010.[2]

The current case was initiated shortly after that. In July 2010, a caller alleged mother neglected and emotionally abused her children. She had been found naked outside of her home, and was taken by paramedics to the hospital, where she was placed on a 72-hour psychiatric hold. Mother tested positive for marijuana and phencyclidine (PCP), and needed to be restrained due to aggressive behavior. Christian, seven years old at the time, stated that he was scared upon seeing his mother naked on the sidewalk.

Sometime later, a Department social worker visited mother's home to attempt an interview regarding the allegations against her. She claimed to have done nothing wrong, and denied any criminal or Department history. At a subsequent meeting with the Department, mother spoke incoherently and appeared paranoid. Mother claimed to have accidentally consumed PCP when she smoked a cigarette she later suspected had been dipped in the substance. The Department then referred mother to a hospital for a second 72-hour hold. Christian, Elijah, and Jeremiah were placed in foster care.

The Department filed a new section 300 petition on behalf of the three children on July 27, 2010. The court ordered Christian and Jeremiah detained, with weekly visits for mother with a "monitor at arm's length from the children at all times." A subsequent psychiatric evaluation of mother revealed no evident mental or psychiatric disorder, and no evidence of prior PCP abuse. After her hospital stay, mother failed to appear for two drug tests and tested positive for marijuana once in August 2010.

At the jurisdictional hearing on September 15, 2010, the court sustained two counts in the petition pursuant to section 300, subdivision (b) due to mother's drug use and mental and emotional problems. On September 23, 2010, the court ordered mother to participate in a drug rehabilitation program with random testing, attend individual

_____

[2] On July 27, 2010, the court released Elijah to his father. Because mother appeals only the adjudication as to Christian, we discuss Elijah and Jeremiah's circumstances only as they bear on that case.

4

counseling, follow recommendations from her psychiatric evaluator, and comply with medication prescriptions. On December 22, 2010, the court declared Christian a dependent, provided mother with reunification services, including twice weekly monitored visits, and ordered mother's compliance with the case plan from September 23, 2010. By this time, Christian had been placed in the home of Mr. and Mrs. A., who were his foster parents in July 2010.

Over the next year, mother demonstrated uneven progress. She moved into stable housing and secured a full-time job, but missed multiple drug tests between September 2010 and May 2011. She tested positive for methamphetamine three times in June and July 2011. In October 2011, she again tested positive for methamphetamine, lost her job the following day, and was discharged from her drug program a week later. Shortly after that she started a new job, and planned to enroll in a new drug program. Her case manager described her as lacking motivation, and stated that she forged her meeting verification forms.

Mother did not attend all visits with Christian, but when she did, she often spent the time using her phone. During other visits, mother brought nothing for the two to do, and would not engage with Christian. Christian described the visits as "fine," and said he liked seeing mother and living with his foster family. Mother rescheduled visits when needed, but canceled her Christmas and New Years Day visits just hours before they were to occur. Over time, mother's visits improved, but she still spent some of the time using her phone. On December 7, 2011, the court found mother was not in compliance with the case plan, and terminated reunification services.

By this time, Christian had begun referring to his foster parents as "mom" and "dad," was not wetting the bed as often, attended vacation bible school, was interested in swimming and karate, was doing fine in school, and planned to start flag football. A Department therapist reported Christian would do better once his foster family adopted him. Visits with Jeremiah were limited due to distance and difficulty obtaining a response from his guardian, but Christian's foster parents often drove to Jeremiah's home

5

to facilitate the visits. They were unable to arrange visits with Elijah because his father did not return phone calls. By February 2012, the Department described Christian as affectionate with the family, and receptive to their parenting style. He said he wanted to live both with mother and Mr. and Mrs. A.

Mother filed a petition pursuant to section 388 on May 17, 2012. She requested that Christian and Jeremiah be placed in her home, or in the alternative, that she be granted liberalized weekend and overnight unmonitored visits. Mother argued the court's order should be changed because she (1) completed 90 days of drug and alcohol rehabilitation, (2) tested negative from December 2011 to April 2012, (3) continued individual therapy, (4) visited regularly with her children, (5) bonded with them by phone, and (6) could offer a permanent and stable home where they could live together.

The court acknowledged mother was progressing, but her overall circumstances still raised concerns. She completed drug programs, adhered to all rules and regulations, and tested negative for drugs. Treatment officials had no concerns about her. Mother planned to continue attending group meetings, and her relapse plan included contacting her sponsor, staying occupied with work, relying on her mother, and attending Narcotics Anonymous meetings. When she needed to attend meetings, mother said she would leave her children with grandmother. However, the Department was concerned about this childcare arrangement since grandmother recently had lost family reunification services, was on parole, and had a history of drug abuse.

Mother continued to cancel visits at the last minute and often arrived late. The social worker monitored the visits, with Mrs. A. present because Christian would become upset if she left. Christian said he would be happy being adopted or living with mother, and understood that he could love her but not want to see her because of how she treated him. Mother admitted that she previously thought she could slip through the cracks, but now she realized she wanted her children back. On June 29, 2012, the court partially granted mother's section 388 petition, continued Christian's placement in foster care, and granted de facto parent status for Mr. and Mrs. A.

6

Mother filed a second petition pursuant to section 388 on September 24, 2012. Once again, she requested the children be placed with her or that she be granted liberalized visitation. In addition to the arguments in her May 2012 petition, mother contended the change was warranted because she recently was appointed conservator for her brother, and her visits with the children were going well. She claimed she had been sober for the past 10 months, and continued with group meetings and individual therapy. Her therapist indicated that additional work was needed before mother could demonstrate she was ready to be a parent again. The Department's response noted few changed conditions, except that mother had obtained bunk beds for her children.

Visits with Christian had improved. Mother was now arriving on time, and Christian was less anxious, although he still wanted his foster mother present. Mother displayed more affection, and often brought activities for the two to complete. She improved her disciplining of Christian for acting out. But mother still needed monitoring during the visits, and sometimes Christian would be sad afterward. A Department worker contrasted mother's history of relapses, missed and positive drug tests, and need for more counseling, with how her children thrived in their caretaker settings. According to the Department, disrupting this progress would harm the children. As a result, at the October 30, 2012 hearing, the court terminated mother's parental rights as to Christian and found the parental relationship exception under section 366.26, subdivision (c)(1)(B)(i) did not apply.[3]

During a July 2010 proceeding, the court determined that ICWA did not apply to Christian's case. Information later surfaced indicating that the family might have had Indian heritage. Jeremiah's paternal grandmother said mother had some Indian ancestry, and mother now claimed her relatives were Navajo. In May 2012, the court ordered notice be given to three tribes: the Colorado River Indian Tribes, the Ramah Navajo School Board, and the Navajo Nation. All three confirmed Christian's noneligibility for

---

[3] Finding a section 366.26, subdivision (b)(1)(C)(i) parental relationship exception applied to Jeremiah, the court terminated mother's parental rights only as to Christian.

7

enrollment. In September 2012, the Department reported that return receipts had been received from all tribes, but did not submit copies of the notices sent. Nevertheless, on October 30, 2012, the court found the tribes to be properly noticed, and that ICWA did not apply. Mother filed a timely notice of appeal.

## DISCUSSION

### I

Mother challenges the court's order denying her September 2012 section 388 petition. She argues the court misunderstood the evidence and abused its discretion in terminating her parental rights. Her petition, she contends, demonstrates a change in circumstances sufficient to warrant a modified court order.

"The grant or denial of a section 388 petition is committed to the sound discretion of the trial court and will not be disturbed on appeal unless an abuse of discretion is clearly established. [Citation.] A trial court exceeds the limits of legal discretion by making an arbitrary, capricious or patently absurd determination. [Citation.]" (*In re Shirley K.* (2006) 140 Cal.App.4th 65, 71.) "'When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.]" (*In re Stephanie M.* (1994) 7 Cal.4th 295, 319.) However, when evaluating the credibility and weight of supporting evidence, we apply a substantial evidence standard. (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1393-1394.)

Section 388, subdivision (d) permits modification of a court order when "it appears that the best interests of the child or the nonminor dependent may be promoted by the proposed change of order . . . ." (§ 388, subd. (d).) "The petitioner has the burden of showing by a preponderance of the evidence (1) that there is new evidence or a change of circumstances *and* (2) that the proposed modification would be in the best interests of the child." (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615.) In determining whether circumstances have changed, "[t]he court may consider factors such as the seriousness of the reason leading to the child's removal, the reason the problem was not resolved, the

8

passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner. [Citation.] In assessing the best interests of the child, 'a primary consideration . . . is the goal of assuring stability and continuity.' [Citation.]." (*Id.* at p. 616.)

Here, the juvenile court properly weighed the evidence. Focusing on Christian's time in dependency, the court noted the "case has been in the system this time for 27 months." It highlighted how he endured the foul conditions at grandmother's house and his mother's PCP-induced incident. When Christian wrote a two-page narrative discussing his life, he mentioned these two incidents. Because mother indicated grandmother would provide childcare, the court emphasized it was the same grandmother who caused the incident leading to Christian's first detention. And while mother had attended therapy, she remained in the "early stages of treatment," and her therapist indicated that she "'need[ed] to continue in parenting classes.'"

Considering his attachment and continuity of care, the court noted that Christian wanted to live with both mother and his foster parents. He was afraid when his foster mother was not present during visits. He called his foster parents "mom" and "dad." Mother has never been allowed unmonitored visits with Christian following the July 2010 incident, despite remaining sober for 10 months. As a result, the juvenile court found that circumstances appeared to be changing, but had not changed "in any way." "A petition which alleges merely changing circumstances and would mean delaying the selection of a permanent home for a child to see if a parent, who has repeatedly failed to reunify with the child, might be able to reunify at some future point, does not promote stability for the child or the child's best interests. [Citation.]" (*In re Casey D.* (1999) 70 Cal.App.4th 38, 47.) The court did not abuse its discretion in finding mother's recent progress was insufficient in light of her past failures and Christian's interest in stability. Accordingly, we affirm the court's order denying her section 388 petition.

II

Mother argues the court erred in failing to find the beneficial relationship exception to the termination of parental rights under section 366.26, subdivision (c)(1)(B)(i) applies in this case. She contends that her bond with Christian, as well as her ability to maintain a home where Christian could preserve his sibling group, provide substantial evidence that the exception applies.

There is a split of authority on the standard of review for section 366.26 orders. Most courts apply the substantial evidence standard (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [using substantial evidence standard to review whether parent-child relationship should continue under section 366.26]), but at least one court has used the abuse of discretion standard (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [applying abuse of discretion standard where juvenile court determined, under section 366.26, which kind of custody was appropriate for minor]). Recently some courts have applied both standards, which we find to be appropriate here. A "juvenile court's decision whether an adoption exception applies involves two component determinations: a factual and a discretionary one. The first determination—most commonly whether a beneficial parental or sibling relationship exists . . . —is, because of its factual nature, properly reviewed for substantial evidence. [Citation.] The second determination . . . is whether the existence of that relationship . . . constitutes 'a compelling reason for determining that termination would be detrimental to the child.' [Citation.] This '"quintessentially" discretionary decision . . .' is appropriately reviewed under the deferential abuse of discretion standard. [Citation.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 622.) "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.*, *supra*, at p. 576.)

An order terminating reunification services presumes adoption as the permanent plan. (§ 366.26, subd. (b)(1).) However, a statutory exception may apply where the

"court finds a compelling reason for determining that termination would be detrimental to the child" and "[t]he parent[] ha[s] maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B).) "When contesting termination of parental rights under [this exception], the parent has the burden of showing either that (1) continuation of the parent-child relationship will promote the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents [citation] or (2) termination of the parental relationship would be detrimental to the child. [Citation.] Put another way, [the Department] is not required to produce evidence demonstrating that a minor would not benefit from continued parental contact. [Citation.]" (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466, italics omitted.) In assessing the detriment to the child, courts consider the child's age, the portion of the child's life spent in the parent's custody, the positive and negative effects of interactions between parent and child, and the child's particular needs. (*Id.* at p. 467.)

Mother failed to show that her relationship with Christian outweighs the benefits of adoption. Christian twice endured a traumatic removal from his mother's custody. Mother continued a pattern of noncompliance with her case plan, including her failure to demonstrate a consistent relationship with Christian. Even though her visits recently had improved, mother still needed monitoring. Christian said he did not feel safe during visits with mother, even though he loved her, and he continued to ask that his foster mother be present. In contrast, Christian continues to progress with Mr. and Mrs. A. He said he wanted to live with them, and he called his foster parents "mom" and "dad." While living with Mr. and Mrs. A., Christian was not wetting the bed as often, attended vacation bible school, was interested in swimming and karate, was doing fine in school, and planned to start flag football. Mother did not meet her burden of demonstrating that her relationship with Christian, which is inconsistent at best, outweighs all that Christian stands to gain from adoption. In addition, she failed to demonstrate how terminating her rights would harm him. For these reasons, the court did not abuse its discretion in finding

11

the benefits of adoption outweigh any potential negative consequences from terminating parental rights.

Finally, Mother argues that the section 366.26, subdivision (c)(1)(B)(v) exception for preserving a sibling relationship applies here. But, there is nothing in the record to support an argument that Christian will not continue his relationship with Jeremiah and Elijah. To the contrary, his prospective adoptive family has attempted to maintain consistent contact with his brothers, despite obstacles in coordinating visits. Accordingly, the juvenile court did not abuse its discretion in finding that a section 366.26 exception did not apply here.

III

Mother claims the termination order should be reversed because notice was improper pursuant to ICWA and the related California statute. (25 U.S.C. § 1901; § 224.2.) The Department concedes that no proof of notice was submitted. Thus, our only inquiry in this case is to determine the appropriate remedy for inadequate ICWA notice.

"The ICWA confers on tribes the right to intervene at any point in state court dependency proceedings. [Citations.] 'Of course, the tribe's right to assert jurisdiction over the proceeding or to intervene in it is meaningless if the tribe has no notice that the action is pending.' [Citation.] 'Notice ensures the tribe will be afforded the opportunity to assert its rights under the [ICWA] irrespective of the position of the parents, Indian custodian or state agencies.' [Citation.]" (*Dwayne P. v. Superior Court* (2002) 103 Cal.App.4th 247, 253 (*Dwayne P.*).) Accordingly, pursuant to ICWA, "where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention." (25 U.S.C. § 1912, subd. (a).) The analogous California statute provides, in pertinent part, that "[p]roof of the notice, including copies of notices sent and all return receipts

12

and responses received, shall be filed with the court in advance of the hearing except as permitted under subdivision (d)."[4] (§ 224.2, subd. (c).)

A court order is voidable when ICWA notice is improper. (25 U.S.C. § 1914; *Dwayne P.*, *supra*, 103 Cal.App.4th at p. 254.) However, our review is subject to the harmless error test. "An ICWA notice violation may be held harmless when the child's tribe has actually participated in the proceedings [citation] or when, even if notice had been given, the child would not have been found to be an Indian child, and hence the substantive provisions of the ICWA would not have applied." (*In re S.B.* (2005) 130 Cal.App.4th 1148, 1162, fn. omitted [finding that an earlier inquiry into Indian ancestry would not have impacted the emergency placement of a child]; see also *In re Christian P.* (2012) 208 Cal.App.4th 437, 452.) We review the juvenile court's finding of ICWA notice adequacy for substantial evidence. (*In re J.T.* (2007) 154 Cal.App.4th 986, 991.)

Respondent concedes that notice was inadequate, even though on October 30, 2012, the court found that tribes were properly noticed, and that ICWA did not apply. Months earlier, the court had instructed the Department to provide notice to three tribes. Three letters confirmed Christian had no Indian heritage. But the Department failed to file copies of the notices sent to the tribes and government agencies, as the California statute requires. (§ 224.2, subd. (c).) As a result, there was no way for the court to determine whether the Department had complied with the notice provisions of ICWA.

Despite the inadequate notice, mother has not shown that she would achieve a more favorable result without the notice violation. All tribes returned letters indicating that Christian is not an Indian child. Thus, in the absence of the ICWA notice error, there is no indication that mother's parental rights would not have been terminated. In this situation, the proper remedy is a limited reversal and remand to allow the Department to comply with ICWA.

---

[4] The parties do not argue that subdivision (d) applies here. (§ 224.2, subd. (d).)

## DISPOSITION

The order terminating mother's parental rights is conditionally reversed.  The matter is remanded to the juvenile court with directions to vacate its finding that ICWA does not apply and to instruct the Department to complete ICWA notice.  If, after proper notice, the court finds that Christian is an Indian child, the court shall proceed in conformity with ICWA.  If, after proper notice, the court finds that Christian is not an Indian child, the order terminating parental rights shall be reinstated.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

EPSTEIN, P. J.

We concur:

WILLHITE, J.

MANELLA, J.

14